## Case No. 7,343.

### The JOHN GILPIN.

### [Blatchf. Pr. Cas. 291.][1]

### District Court, S. D. New York. Dec., 1862.[2]

---

[1] [Reported by Samuel Blatchford. Esq.]

[2] [Reversed in Case No. 7,344.]

BETTS, District Judge. This vessel and cargo were captured, as prize, April 25, 1862, in the Mississippi river, opposite the city of New Orleans, by the United States gunboat Katahdin, and were brought thence to this port for adjudication. They were here libeled September 16, 1862, and the monition and attachment issued thereon were returned duly served October 7 thereafter. On the 26th of September, 1862, a claim to the cargo, consisting of 318 bales of cotton, was interposed by Nahum Stetson, treasurer of the Weymouth Iron Company, a corporation established by the laws of the state of Massachusetts, averring that the company were owners of the cotton at the time of its attachment, with which claim deposition was offered, as a test affidavit, and filed on the return day of the monition, October 7. On the same day Nathaniel H. Babson and six other persons filed a claim and answer to the libel, alleging that they were citizens of Massachusetts and owners of the vessel. Those claims and answers sufficiently denied the legality of the capture of the vessel and cargo as prize, and, in addition to that issue, attempted to make evidence, by allegations therein of various matters of excuse and defence against the charges in the libel, extraneous and independent of the issue of prize or no prize. This mode of pleading is faulty, and not allowable as a primary defence in a prize suit. The point has been largely considered in this court in repeated cases recently before the court, and the decisions fix the practice which must prevail here until it is changed by a contrary determination of the appellate courts. The Delta [Case No. 3.777]: The Empress [Id. 4.476].

No papers relating to the vessel and cargo were found on board of her when she was captured, or have been brought into this port. The evidence embraces only the examination of the mate, who was on board at the capture, and was afterwards brought with the vessel to this district. The assistant district attorney, by affidavit on file, sufficiently excuses the failure to produce other members of the crew, they having been dispersed in the general disturbance attending the capture of the city of New Orleans by the United States naval forces, at the same time with the seizure of this vessel, and the apprehension and imprisonment of the master of the vessel as a notorious rebel, by the military authority. This case is thus brought within the authority of the preceding case of The Elizabeth and Cargo [Id. 4,350], and the usages under the continental and British practice in prize suits.

The mate testifies, on his preparatory examination, that he resides in New Orleans, and his family in the state of Louisiana; that he was present at the capture of the vessel at the wharf of Algiers, in the Mississippi, opposite New Orleans; that he heard the captain say that Dundridge, who resides in New Orleans, was owner of the vessel; that Forsyth, the master of the vessel, resides in New Orleans; that six persons were on board when the vessel was captured; that eight, including a supercargo, composed the ship's company, all of whom came on board at New Orleans; that he, the witness, was first mate when the vessel was taken: that he does not know the exact port to which she was destined when she left New Orleans; that he was told by her master that it was some port of the northern states; that she was laden with cotton and staves; that he does not know that she cleared from New Orleans, and does not know the owner of the cargo; and that he, the witness, and the master knew that New Orleans was under blockade before the vessel left or attempted to leave that port. The vessel left New Orleans on the 15th or 16th of February last, and went down the river several miles below Forts Jackson and St. Philip, and there anchored for several days, when the commander of the forts ordered the vessel back above the forts, and the design to get out was given up. The supercargo returned to New Orleans. The crew consented, at the master's request, to stay with the vessel until the blockade should be raised. No further attempt was made to get out of New Orleans.

The court has had occasion, in more than one previous instance, to advert to the rule of the prize law which subjects neutral property to capture when attempting to violate a legal blockade. The offence is not consummated merely by the existence of a purpose to commit the act, but the vessel must be intercepted while endeavoring to carry out the guilty design. However earnestly the criminal intent may have been entertained and proceeded upon for a time, if it be really given up before the arrest, the property is not liable to confiscation because of the pre-

vious wrongful purpose. This is wholly a question of evidence, and, no doubt, a vessel setting out with the object of evading a legal blockade will be relieved from the penalty following her detection in seemingly adhering to that purpose in her doings, only upon clear evidence that at the time of capture the fraudulent and guilty intention had been wholly relinquished. 1 Kent, Comm. 147. It is not the mere mental design which the law punishes, but the overt act, in starting for or proceeding towards the prohibited port, with the knowledge that it is blockaded, and continuing on that course up to the arrest. Hall. Int. Law, c. 23, § 23, and citation. Had this capture been made whilst the vessel was proceeding down the river from New Orleans, the vessel and cargo would have been, within the meaning of the rule, guilty of an overt act. They stopped, however, before leaving the port, waiting for authority to make the contemplated voyage, and returned to the place of departure, where they remained until arrested as prize. The cause of the seizure was not that the vessel and cargo were in the act of evading the blockade, but was a cause not connected with that offence. I think, therefore, that on the facts and the law of the case that charge is not sufficiently proved to demand the condemnation of the vessel or cargo.

The libellants having suspended the proceedings against the vessel, and prosecuted them against the cargo, THE COURT said:

The prosecution of the vessel under this capture having, for the present, been suspended by the libellants, and the action being now continued against the cargo, no judgment is declared in relation to the vessel. The cargo was seized while waterborne. It was obtained and shipped with the intention to transport it to another state, though a loyal one, of the Union. In this respect, it stands subjected to a double liability to seizure and condemnation. It was enemy property, procured by purchase in an enemy port, and also a product of the enemy country, and it could not, in that condition, be obtained and brought thence by our own citizens, through purchase, or by barter or exchange, because trade and traffic of every description with an enemy, during a state of war, is, by the law of nations, inhibited to the subjects of the nation prosecuting the war (Wheat. Capt. Mar. 101; 1 Kent, Comm. 74, 81; Hall. Int. Law, 470, 484, 498); and, by statute, all commercial intercourse between citizens of the loyal states and those belonging to the insurrectionary ones is declared to be unlawful, and the property acquired through such intercourse is subjected to forfeiture (12 Stat. 257). A decree of condemnation and forfeiture of the cargo of the schooner will be entered.